**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 25-285 |
| | ) | |
| THOMAS DORN | ) | |

**MEMORANDUM OPINION**

Presently before the Court is Defendant's Motion for Reconsideration of Order of Detention, wherein he requests that the Court enter an order releasing him from pretrial detention, which is opposed by the Government. (*See* Docket Nos. 38, 43, 44). After careful consideration of the parties' positions, review of the detention hearing transcript and evidence entered at the detention hearing, and the referenced Pretrial Services Report, Defendant's Motion will be denied. As required by 18 U.S.C. § 3142(i)(1), the following includes the Court's findings of fact and statement of the reasons for detention.

**I.      BACKGROUND**

**A.  PROCEDURAL HISTORY**

On October 28, 2025, Defendant was charged in a criminal complaint with two counts of interstate threats, in violation of 18 U.S.C. § 875(c), and a warrant was issued for his arrest. (Docket Nos. 5, 7). Defendant made an initial appearance on October 29, 2025, and he was detained pending a detention hearing which was held on November 13, 2025 before Magistrate Judge Kezia O.L. Taylor. (Docket Nos. 12, 21). Following the hearing, Judge Taylor found that the Government proved by clear and convincing evidence that no condition or combination of conditions of release will reasonably assure the safety of any other person or the community and

1

thus he was ordered to remain detained pending trial in this matter.  (Docket Nos. 23 at 3; 42 at 53).

On November 18, 2025, Defendant was charged in an 11-count Indictment with the following: at each of Counts One through Ten with interstate threats, in violation 18 U.S.C. § 875(c), all for conduct occurring on or about October 17, 2025; and at Count Eleven with influencing, impeding, or retaliating against a federal official or federal law enforcement officer by threat, in violation of 18 U.S.C. §§ 115(a)(1)(B) and 115(b)(4), for conduct occurring on or about October 27, 2025.  (Docket No. 25).  He was arraigned and pled not guilty to the charges on December 2, 2025.  (Docket Nos. 30, 31).

Defendant now moves for reconsideration of the detention order, arguing that he should be granted pretrial release.  (*See generally* Docket Nos. 38, 43).  Although Defendant recognizes that the weight of the evidence against him is significant, he points out that his criminal history is minimal, he previously maintained full-time employment, and he does not have a documented history of mental illness or substance abuse.  (Docket No. 38, ¶¶ 6.a, 6.b, 6.c, 6.e, 6.f).  Defendant also recognizes that detention was ordered because Judge Taylor found that he posed a danger to specific victims and the community, but he submits that is no longer a concern because "any munitions available to [him] have been seized by the Government" and "the allegations [in this case] are a matter of public record."  (Docket No. 43 at 4).  Defendant claims that he is amenable to any conditions deemed necessary to assure the safety of any specific victim and the community and advocates that he therefore should be released on electronic home monitoring with his neighbor, Jeremy Gent, serving as a third-party custodian.  (Docket Nos. 38, ¶ 7.a; 43 at 4, 5).

The Government opposes Defendant's Motion requesting pretrial release, contending that Defendant repeatedly voiced his intent to murder Victim 1 and Victim 2 as alleged in Counts One

through Ten of the Indictment, rape Victim 1 as alleged in Count Nine, and shoot his postal carrier followed by a shooting at his local post office as alleged in Count Eleven, and the evidence presented at the detention hearing supports that Defendant's threats were not empty ones. (Docket No. 44 at 10). In the Government's view, other than an unvetted third-party custodian, Defendant provides nothing to justify his request to reconsider Judge Taylor's detention decision. (*Id.*).

After reviewing the transcript of the detention hearing before Judge Taylor and considering the parties' briefing, the Court concludes that Judge Taylor correctly determined that the Government has proved, by clear and convincing evidence, that no condition or combination of conditions would reasonably assure the safety of the community if Defendant were to be released, therefore he must be detained pending trial or other disposition of this matter.

### B. EVIDENCE ADDUCED AT THE DETENTION HEARING

At the detention hearing, the Government presented the testimony of Trevor Tucker, who is a special agent ("SA") with the Federal Bureau of Investigation and participated in the investigation of Defendant. (Docket No. 42 at 6, 11). The Government also introduced through SA Tucker's testimony Government Exhibits 1, 2, 3, 4, 5, and 6, which are attached to its Response in Opposition to Defendant's Motion.[1] (*See* Docket Nos. 44-2 – 44-7).

SA Tucker testified that the FBI was notified by the United States Marshal Service about a complaint of an individual making threatening communications. (Docket No. 42 at 12). The victim of those communications, who was interviewed by the FBI, indicated that the communications were received on or about October 17, 2025. (*Id.*). At that time, the victim was located in Colorado. (*Id.*). Through an emergency disclosure request, law enforcement identified the telephone number of the person who called the victim as belonging to Defendant. (*Id.*). The

---

1       The Court has been provided with a digital storage device containing recordings of the voicemail messages that comprise Government Exhibits 1 and 2.

victim also identified Defendant as the individual who called.  (*Id.*).

SA Tucker testified that Government Exhibits 1 and 2, which are recordings of profanity laden voicemail messages that Defendant left for the victim, are accurately summarized in ¶¶ 5 and 6 of the Affidavit in support of the Criminal Complaint in this case.  (Docket No. 42 at 13-14).  The voicemail messages included the following statements:

- "I wish I was in Colorado because I would have smashed you in your fucking head and killed you by now, but not in the way that they fucking think. You'd be dead and not even found. "

- "Where's my $105,000? I'll fucking; bro, I would seriously . . . smash your head with a fucking sledgehammer over that shit."

- "Why don't you make me move to Colorado, give me my job, and I'll kill all you fucking people, like a fucking man. The first person that I would have fucking killed was Judge [Last Name]. I would have ran right to her fucking house, and blew her head right off – closed casket, if I knew that she was hacking me, you fucking bitch."

- "I'm ready to fucking kill you, like I said.  Blow your fucking head to smithereens straight off your fucking body, bro."

- "Basically, at this point, I pretty much decided, the, one of the things that I can do to help it is to kill one of you people. Like I said, if the police are literally afraid of you, and turnaround and go the other way, that's where it's at. So probably I'm going to go shoot [Victim 2] in the head. I'm just going to go up to her porch and knock on the door and shoot her."

- "And, uh, if I can't go get [Victim 2] at her home and shoot her in the fucking head at her home to basically make this stop, so I can have a clean house, basically clean my house, I'm gonna go to the law firm and kill them."

(Docket No. 5-1, ¶¶ 5, 6).

SA Tucker also testified concerning Government Exhibit 3, which is an Incident Report from the Harrison Township Police Department.  (Docket Nos. 42 at 14; 44-4).  The Report, which is dated October 27, 2025, states that an unknown male called the post office and claimed his postal carrier was harassing him and he would shoot the postal carrier and come to the post office and

shoot up the place.  (Docket Nos. 42 at 15; 44-4 at 1).  The caller ID identified a particular telephone number for the unknown male caller, which the police determined was associated with Defendant at 21 Pine Street, Natrona, Pennsylvania.  (Docket Nos. 42 at 15; 44-4 at 2).

As SA Tucker testified, on October 28, 2025, he and other agents conducted surveillance at 21 Pine Street and positively identified Defendant as he left the residence.  (Docket No. 42 at 15-16).  When Defendant later returned to the residence, the FBI announced their presence and requested that he come out, which he did without incident.  (*Id.* at 16).  Defendant was then taken into custody, and SA Tucker and other agents executed a search warrant at his residence.  (*Id.* at 17).  SA Tucker testified that agents seized numerous firearms as shown on Government Exhibit 4, which is a photograph of the firearms and other items seized during the search.  (*Id.*; Docket No. 44-5).  Some of the firearms had loaded magazines and other firearms were unloaded.  (Docket No. 42 at 17).  The agents also seized spotting scopes, one of which was positioned facing the front door of the residence.  (*Id.* at 18).  A firearm with an attached bipod, magazine, and suppressor was located near the large scope.  (*Id.* at 18-19).  In all, the search resulted in the seizure of eleven firearms, firearm suppressors, and firearm scopes as depicted on Government Exhibit 4.  (Docket No. 44-5).

Defendant's cell phone also was seized and subsequently searched pursuant to a warrant.  (Docket No. 42 at 19).  SA Tucker testified that Government Exhibit 5 is an excerpt of some of Defendant's text messages from his phone.  (*Id.* at 20; Docket No. 44-6).  Defendant stated, in part, the following in those text messages:

- "And if I lose my cat that I love deeply I am killing your daughter's dog and probably her over this"

- "OK but then I have to kill you  And I am looking for your daughter also To get revenge  I'm going to kill your dog"

- "OK and then they will arrest me and I will be out of jail with more issues and the[n] I will come and kill you sooner"

- "And if you call the cops I am going to need to shoot you"

(Docket Nos. 42 at 22-23; 44-6 at 1-4).

SA Tucker also testified about Government Exhibit 6, which is an excerpt of communications from Defendant's cell phone through the WhatsApp phone application with an individual named Margaret.  (Docket Nos. 42 at 24-25; 44-7).  Defendant's communications through WhatsApp included, in part, the following:

- "If I can't work and I run out of money a massacre is the only option"

- "It's better I am dead"

- "So I can kill a few postal workers also  They threw my appeal out  Charlie Kirk died at 29  40 is enough  It's better I die and kill as many people who are responsible"

- "Otherwise I am going to need to come up to ny and do what your brother said I would do  And just die at 40  I am going to massacre the people"

- "I don't think your going to take this seriously and I don't want to be cremated  When the cops kill me if they do  Because I am going to kill a lot of people over this  At least 20"

- "I'm going to kill your mother also if I can"

- "Otherwise there is going to be d day and a lot of people are going to die  20 to 50 people  In New York are going to die on d day  With Adam Lanza"[2]

- "I need to retaliate and just die at this point I don't have any options"

- "With the amount of money I have It might be world War 3  It's like a twilite zone nightmare  That I am living in is why I have ptsd  I don't

---

2        Adam Lanza "perpetrated the Sandy Hook Elementary School shooting . . . .  On December 14, 2012, he fatally shot his mother, Nancy Lanza, at their home in Newtown, Connecticut, before driving to Sandy Hook Elementary School, where he killed 20 children aged six and seven, and six adult staff members. He then killed himself as law enforcement arrived at the school."  *See* https://en.wikipedia.org/wiki/Adam_Lanza (last visited July 2, 2026).

really want to live anymore  In a twilite zone nightmare  But I will for a war  To kill these people"

(Docket Nos. 42 at 26-27; 44-7 at 1-3, 5-6, 8, 9).

SA Tucker was then subject to cross-examination by the defense.  (Docket No. 42 at 27-32).  SA Tucker did not believe that there were any other firearms in Defendant's residence or in his vehicles, other than those that were seized during execution of the search warrant.  (*Id.* at 28-29).  The defense did not present any evidence at the detention hearing.  (*Id.* at 41).

After receiving the foregoing evidence at the hearing, Judge Taylor analyzed the four factors required to be considered under the Bail Reform Act,[3] and found that there is no condition or combination of conditions that will reasonably assure the safety of any person or the community if Defendant were to be released.  (Docket No. 42 at 47-53).  Accordingly, Judge Taylor entered an order detaining Defendant pending trial or other disposition of this matter.  (*Id.* at 53; Docket No. 23).  Defendant's appeal of the detention order ultimately followed.  (Docket No. 38).  Briefing on Defendant's Motion is concluded, and the matter is ripe for disposition.  After review of the record, the Court affirms the detention order.

## II.    **LEGAL STANDARD**

The Bail Reform Act of 1984, 18 U.S.C. § 3141, *et seq.* (the "BRA"), governs release and detention pending judicial proceedings.  Pursuant to 18 U.S.C. § 3145(b), "[i]f a person is ordered detained by a magistrate judge, or by a person other than a judge of a court having original

---

[3]    As to those factors, Judge Taylor commented that the charged offenses are serious because they involve threats to inflict violence and harm upon others; the weight of the evidence is substantial and includes testimony by SA Tucker, an Incident Report from the Harrison Township Police Department, voicemail messages, and messages from Defendant's cell phone concerning the alleged threatening communications; Defendant does not have an extensive criminal history and he has a documented employment history, but he was currently unemployed; and the danger to any person or the community "is really, really high here," given that a local postal worker was threatened with violence, as well as two other victims.  (Docket No. 42 at 48-52).  Overall, Judge Taylor found that the nature and circumstances of the alleged offenses, the weight of the evidence against Defendant, and the danger posed to any other person or the community weighed in favor of detention.  (*Id.* at 52).

jurisdiction over the offense and other than a Federal appellate court, the person may file, with the court having original jurisdiction over the offense, a motion for revocation or amendment of the order."  A district court exercises *de novo* review over a detention order entered by a magistrate judge.  *United States v. Delker*, 757 F.2d 1390, 1394 (3d Cir. 1985).  "De novo review does not require an additional evidentiary hearing[,]" and the district court "may make its independent determination based solely upon the evidence introduced at the prior hearing."  *United States v. Kolonis*, No. 2:20-cr-0146, 2020 WL 5253192, at *3 (W.D. Pa. Sept. 3, 2020) (quoting *United States v. Burgess*, No. 2:09-cr-150, 2009 WL 2038148, at *2 (W.D. Pa. July 8, 2009)); *see also United States v. Bastianelli*, Crim. No. 17-305, 2018 WL 1015269, at *4 (W.D. Pa. Feb. 22, 2018) ("The Court retains the discretion to make its determination after reviewing the record developed before the U.S. Magistrate Judge or to accept additional evidence from the parties and rule on the expanded record.").  The Court may incorporate the transcript of the proceedings before the magistrate judge and does so here.  *See United States v. Chagra*, 850 F. Supp. 354, 357 (W.D. Pa. 1994).  The Court "may also consider any additional evidence or proffers submitted in conjunction with any supplemental proceedings," which it likewise does here.[4]  *Burgess*, 2009 WL 2038148, at *1 (citation omitted).

As noted, the availability of pretrial release is controlled by the BRA, which provides that a defendant must be released on his personal recognizance or upon execution of an unsecured appearance bond unless the court determines that "such release will not reasonably assure the appearance of the person as required or will endanger the safety of any other person or the community."  18 U.S.C. § 3142(b).  Following a hearing, if the judicial officer finds that no

---

4       As stated, the Court has reviewed the transcript of the proceeding conducted by Magistrate Judge Taylor, considered the Pretrial Services Report and the information set forth in Defendant's Motion and supporting brief, and the Government's Response, and concludes that a hearing is not necessary because the record has been fully developed.

condition or combination of conditions of release will reasonably assure the defendant's appearance and the safety of the community, detention must be ordered. 18 U.S.C. § 3142(e)(1). In determining whether there are conditions of release that will reasonably assure the defendant's appearance and the safety of the community, the judicial officer must consider the § 3142(g) factors concerning:

> (1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence, a violation of section 1591, a Federal crime of terrorism, or involves a minor victim or a controlled substance, firearm, explosive, or destructive device;
>
> (2) the weight of the evidence against the person;
>
> (3) the history and characteristics of the person, including--
>
>> (A) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and
>>
>> (B) whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law; and
>
> (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release.

18 U.S.C. § 3142(g).

## III.    DISCUSSION

After considering the relevant factors under § 3142(g) in this case, Judge Taylor found that the Government sustained its burden to prove by a clear and convincing evidence that no condition or combination of conditions of release will assure the safety of any other person and the community if Defendant were to be released. *See Delker*, 757 F.2d at 1399; *United States v.*

*Himler*, 797 F.2d 156, 160 (3d Cir. 1986). This Court agrees, and finds that pretrial detention was, and is, appropriately ordered in this case. In reaching this decision, the Court has conducted an independent examination of the record as a whole and balanced the four factors set forth in 18 U.S.C. § 3142(g). For reasons that follow, the Court finds that the available information and evidence on the relevant factors weigh in favor of detention.

### A.   Nature and Circumstances of the Offenses Charged

The Court first finds that the charged offenses of interstate threats and influencing, impeding, or retaliating against a federal official or federal law enforcement officer by threat, which are crimes of violence under the BRA,[5] are extremely serious. As reflected by the Government's evidence presented at the detention hearing and as alleged in the Indictment, (*see* Docket No. 24), Defendant threatened to murder two victims (by, for instance, smashing an individual in the head with a sledgehammer and shooting an individual in the head), rape one of them, shoot his postal carrier, and carry out a shooting at a post office. As also shown by the detention hearing evidence, Defendant had the means to carry out those threats given that he possessed firearms, scopes, suppressors, magazines, and ammunition that were seized during a

---

[5]     Pursuant to § 3142(g)(1), the Court is to consider "the nature and circumstances of the offense charged, including whether the offense is a crime of violence . . . ." 18 U.S.C. § 3142(g)(1). Defendant states that he "recognizes that his charges may be interpreted as involving a crime of violence." (Docket No. 43 at 2). To be clear, the charged offenses are crimes of violence. As used in the BRA, a "crime of violence" is defined to include "an offense that has as an element of the offense the use, attempted use, or threatened use of physical force against the person or property of another." 18 U.S.C. § 3156(a)(4)(A). Although the Government submits that the charged offenses constitute crimes of violence under this provision, it also correctly notes that there is no need to engage in a categorical approach analysis because the BRA's definition is not limited to an examination of the elements of an offense. (*See* Docket No. 44, ¶¶ 21, 22). To that end, the BRA also defines a "crime of violence" to include "any other offense that is a felony and that, by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense." 18 U.S.C. § 3156(a)(4)(B). The offenses alleged in the Indictment are all felonies, and there was ample evidence presented at the detention hearing that Defendant communicated threats to murder two victims, shoot his postal carrier and commit a shooting at a post office, and he had the means to carry out those threats given that he possessed firearms and related accessories that were seized from his residence and vehicles by law enforcement. Furthermore, even if the charged offenses do not constitute "crimes of violence" under the BRA, the nature and circumstances of the offenses weigh very strongly in favor of detention for the reasons discussed herein.

search of his residence and vehicles. The evidence also showed that communications on Defendant's cell phone indicated he was willing to die in a massacre, if necessary. Consequently, the nature and circumstances of the offenses charged weigh very strongly in favor of pretrial detention.

### B. Weight of the Evidence

As a general matter, the Court observes that the weight of the evidence against Defendant is strong, as reflected by the grand jury's return of the Indictment which establishes probable cause that the offenses occurred. More specifically, while Defendant is presumed innocent of the charged offenses, the Government's evidence introduced at the detention hearing shows that Defendant communicated threats to kill two victims, shoot his postal carrier, and carry out a shooting at a post office. Defendant also expressed that he would massacre "20 to 50 people." The content of Defendant's threats, coupled with the firearms and other weaponry seized from his residence and vehicles, compel the Court to conclude that the weight of the evidence against him is strong, which he does not dispute. (*See* Docket No. 43 at 2) (stating Defendant "acknowledges that the weight of the evidence against him is significant"). Therefore, while recognizing that Defendant is presumed innocent of the charged offenses, the Court agrees with Judge Taylor's reasoning that the weight of the evidence against him favors pretrial detention.

### C. History and Characteristics of Defendant

As to Defendant's background and characteristics, he is almost 40 years old, he was born in Suffern, New York, and he has resided in New Jersey, Texas and Colorado in addition to Western Pennsylvania, where he has lived for the last five years.[6] Defendant's parents,

---

[6] Defendant's background, residence, family ties, employment history, physical and mental health, substance abuse history and criminal history are set forth in the Pretrial Services Report. The Court notes that neither party has objected to the contents of this Report relative to Defendant's background and history.

11

grandmother, and three half-brothers all live in the state of New York. He has no contact with his father and one half-brother, weekly contact with his mother and another half-brother, and occasional contact with his grandmother and a third half-brother. Defendant is currently single, and he does not have any children. As for Defendant's financial circumstances, he had prior consistent work history between 2015 and June 2025, but he was unemployed when he was arrested in this case. To Defendant's credit, his criminal history is minimal, consisting of a prior reckless driving conviction to which he pled guilty and was sentenced to 180 days probation, and he reported no substance abuse history.

Although Defendant also reported no history of mental health treatment, his mother advised that she suspects he may have mental health issues for which he needs treatment. Defendant's mother's concern is substantiated by the fact that the defense filed a Motion for a Competency Evaluation, (*see* Docket No. 54), which remains pending. In this Court's estimation, Defendant's uncertain mental health status militates against pretrial release, particularly when considered in conjunction with the other factors discussed herein that the Court finds strongly weigh against pretrial release.

Finally, in analyzing Defendant's history and characteristics, the Court is cognizant that it must consider all possible conditions of release, including his suggestion that his neighbor, Jeremy Gent, could serve as a third-party custodian. (*See* Docket Nos. 38, ¶ 7.a; 43 at 4) (stating that Mr. Gent "has agreed to serve as a third-party custodian" and "is willing to . . . take some responsibility as his custodian"). The Court appreciates that Mr. Gent is amenable to serving as a third-party custodian for Defendant, but has serious concerns about such an arrangement, regardless of who would assume that role. Although Mr. Gent is no doubt well-intentioned, the mere fact that he is willing to serve as a third-party custodian does not mean that he, or anyone else, could adequately

supervise a defendant who is charged with extremely serious threat offenses. *See United States v. Bey*, Crim. No. 15-87, 2015 WL 7176340, at *5 (W.D. Pa. Nov. 13, 2015) ("[T]he mere fact that a relative or other individual is willing to serve as a third-party custodian for a defendant is not sufficient to justify release on such conditions but is among the factors to be considered when evaluating whether release or detention is appropriate in a given case."). Overall, the Court finds that Defendant's history and characteristics, notably his lack of employment and uncertain mental health, weigh in favor of pretrial detention or constitute a neutral factor at best.

### D. Nature and Seriousness of Danger to Any Person or the Community if Released

The final factor requires consideration of the nature and seriousness of the danger to any person or the community if Defendant is released. To repeat, Defendant is charged with communicating threats to kill two victims, shoot his postal carrier, and carry out a shooting at a post office. Law enforcement seized from his residence and vehicles eleven firearms, scopes, suppressors, magazines and ammunition, which suggest that he possessed the means to carry out the threats. Text and WhatsApp messages contained on Defendant's cell phone also indicated that he was willing to die as a part of a massacre. Considering this evidence, the danger to the two victims, the postal carrier, the post office, and the community in general cannot be understated or ignored. In the Court's estimation, this final factor heavily weighs in favor of pretrial detention.

The Court is not persuaded by Defendant's assertion that any concerns about whether he poses a threat to the specific victims and/or the community is now ameliorated because "any munitions available to [him] have been seized by the Government" and "the allegations [in this case] are a matter of public record." (Docket No. 43 at 4). Although SA Tucker testified that he believed law enforcement seized all of Defendant's firearms when the search warrant was executed, (Docket No. 42 at 28-29), the Pretrial Services Report states that Defendant did not

13

provide any information regarding firearm ownership when he was interviewed, at the advice of his counsel. While it is Defendant's prerogative to decline to disclose such information, that stance does not squarely align with his current assertion regarding law enforcement's seizure of "any munitions available to [him]." Moreover, as the Government points out, Defendant's threatening communications were not limited to shooting people – he also referenced using a sledgehammer. Further, the Court disagrees with Defendant that public awareness of the allegations contained in the Indictment against him somehow mitigates or negates the danger he presents to any person or the community if he is released. Just because specific victims and/or the general public know about Defendant's charges does not mean that they are now insulated from danger if he is released. If the public's awareness of a defendant's charges somehow serves to negate danger, then it could be argued that no defendant, regardless of the offenses charged against him, is a danger to the community once an Indictment is unsealed and is a matter of public record. That is nonsensical.

In sum, after considering the record as a whole, including the serious nature and circumstances of the offenses charged, the substantial weight of the evidence against Defendant, his history and characteristics, and the nature and seriousness of the danger to the community posed by Defendant's release, there is no condition or set of conditions which will reasonably assure the safety of any other person and the community if he were to be released pending trial in this matter. Accordingly, pretrial detention was, and is, appropriately ordered.

14

## IV.     <u>CONCLUSION</u>

Given the Court's finding that no condition or combination of conditions of release will reasonably assure the safety of any other person and the community if Defendant were to be released, his Motion for Reconsideration of Order of Detention, (Docket No. 38), is denied.

An appropriate Order follows.

<u>s/ W. Scott Hardy</u><br>
W. Scott Hardy<br>
United States District Judge

Date: July 2, 2026

cc/ecf:  All counsel of record
      United States Marshal
      United States Pretrial Services